**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC), a nonprofit Latino civil rights organization; Cristina Acosta; Ivan Castillo; Anthony Rios; and Ivan Sanchez, | § § § § § | |
| *Plaintiff*, | § § | CIVIL ACTION NO. _____ |
| v. | § § | Complaint for Declaratory Judgment and Injunctive Relief |
| The City of Houston; and Pat J. Daniel, sued in her official capacity as City Secretary for the City of Houston. | § § § § | |
| *Defendants*. | § § | |

**PLAINTIFFS' ORIGINAL COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

## I.   INTRODUCTION

1. Only two Hispanic candidates have ever been elected to Houston's at-large districts in the history of the City. At the same time, Latinos make up a strong plurality or near majority of Houston's total population.  The Latino voters of Houston have waited for fair redistricting plans. They have waited for years for the City of Houston to end its long relationship with "at-large" districts that dilute the electoral strength of Hispanics. The time has come to replace this old election system that functions solely to dilute the power of Houston's Latino voters.

2. Section 2 of the Voting Rights Act, 52 U.S.C. Section 10301 *et seq*. (Section 2 of the Voting Rights Act of 1965, as amended) prohibits enforcement of any voting qualification, prerequisite to voting, standard, practice, or procedure that results in the denial or abridgment of the right to vote on account of race, color, or language minority status.

1

3. This suit is brought under the Voting Rights Act to challenge the "at-large" election system used by the City of Houston to elect five of its councilmembers, which has deprived hundreds of thousands of minority voters in Houston of their voting rights guaranteed by law.

## II.   PARTIES

4. Plaintiff Cristina Acosta is a registered vote in Houston, Texas, who lives in a Hispanic community that is sufficiently compact and numerous to elect a candidate who is the choice of the minority community in Houston should at-large districts be eliminated and single-member districts created. Ms. Acosta is a minority voter.

5. Ms. Acosta is a consistent voter in Houston's municipal elections and intends to vote in future City of Houston elections. Ms. Acosta can be served by and through her counsel in this cause of action.

6. Plaintiff Ivan Castillo is a registered vote in Houston, Texas, who lives in a Hispanic community that is sufficiently compact and numerous to elect a candidate who is the choice of the minority community in Houston should at-large districts be eliminated and single-member districts created. Mr. Castillo is a minority voter.

7. Mr. Castillo is a consistent voter in Houston's municipal elections and intends to vote in future City of Houston elections. Mr. Castillo can be served by and through his counsel in this cause of action.

8. Plaintiff Anthony Rios is a registered vote in Houston, Texas, who lives in a Hispanic community that is sufficiently compact and numerous to elect a candidate who is the choice of the minority community in Houston should at-large districts be eliminated and single-member districts created. Mr. Rioss is a minority voter.

9. Mr. Rios is a consistent voter in Houston's municipal elections and intends to vote in future City of Houston elections. Mr. Castillo can be served by and through his counsel in this cause of action.

10. Plaintiff Ivan Sanchez is a registered voter in Houston, Texas, who lives in a Hispanic community that is sufficiently compact and numerous to elect a candidate who is the choice of the minority community in Houston should at-large districts be eliminated and single-member districts created. Mr. Sanchez is a minority voter.

11. Mr. Sanchez is a consistent voter in Houston's municipal elections and intends to vote in future City of Houston elections. Mr. Sanchez can be served by and through his counsel in this cause of action.

12. Plaintiff League of United Latin American Citizens ("LULAC") is a national organization that works to advance the economic condition, educational attainment, political influence, housing, health and civil rights of Hispanic Americans through community based programs operating at more than 1,000 LULAC councils nationwide. LULAC is a membership organization, and members of LULAC reside throughout Texas. LULAC members in Texas include: Latino registered voters of Texas who are injured by the dilution of Latino voting strength throughout the City of Houston, and Latino registered voters of Texas who reside in putative city council districts that would increase Latino voting strength in the City of Houston should "at-large" districts be enjoined.

13. The City of Houston is a defendant in this action. It is the largest and greatest city in Texas governed by and through its charter and Texas Law. It may be served at City Hall, 901 Bagby St., Second Floor, Houston, Texas 77002.

14. Ms. Pat J. Daniel is a defendant in this action. She is the current City Secretary for the City of Houston. She is sued in her official capacity. The City Secretary of the City of Houston administers all municipal elections. She may be served at Office of the City Secretary, 900 Bagby St., Rm. P101 Houston, TX 77002.

### III.   JURISDICTION AND VENUE

15. Plaintiffs' complaint arises under the United States Constitution and federal statutes. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3) & (4)  and 52 U.S.C. §§ 10301.

16. Venue is proper in the Southern District of Texas. 28 U.S.C. § 1391(b)(1) because all defendants reside in this district.

17.  Plaintiff seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

### IV.   FACTS

**The Demography of the City of Houston**

18. The City of Houston is the fourth largest city in the United States of America.

19. According to the 2020 U.S. Census, there are 2,304,580 people residing in the City of Houston.

20. Houston, Texas is one of the most diverse large cities in all of North America and extends into three Texas Counties (Harris, Montgomery, and Fort Bend).

21. According to the 2020 U.S. Census, the total population and voting age population of the City of Houston is comprised of the following demographics:

| Race/Ethnicity | Total Population | Voting Age Population |
|---|---|---|
| Anglo or White | 545,989 | 466,667 |
| Black or African American | 556,318 | 420,420 |
| Hispanic or Latino | 1,013,423 | 716,178 |
| Asian American | 188,594 | 150,478 |

4

22. Voting Age Population (VAP) is made up of adults above the age of 18, regardless of whether they are registered to vote or eligible for registration. Citizen Voting Age population, also called "CVAP", estimates adults that are eligible for voter registration.

23. The American Community Survey ("ACS") is a survey instrument issued and administered by the U.S. Census Bureau that estimates CVAP population for various demographics. According to the 2016-2020 ACS, the City of Houston has the following CVAP population by demographic:

| Race/Ethnicity | CVAP Population % |
|---|---|
| Anglo or White | 33.5 % |
| Black or African American | 27.8 % |
| Hispanic of Latino | 30.9 % |
| Asian American | 6.0 % |

24. As of the 2020 general election, the City of Houston had 1,188,974 registered voters.

25. Spanish Surname Voter Registration ("SSVR") is a statistical measure created by the Texas Secretary of State that estimates the number of registered voters that may be Latino voters.

26. As of the 2020 general election, the Secretary of State of Texas determined that 23.1% of the City of Houston were Spanish Surname Registered Voters.

27. Hispanics or Latinos are the largest plurality of the City of Houston in total population.

28. Hispanics or Latinos are the largest plurality of the City of Houston in Voting Age population.

29. In fact, Hispanics or Latinos are the second largest plurality of Citizen Voting Age Population in the City of Houston, trailing only Anglos in CVAP.

30. However, in terms of voter registration, non-Spanish surname voter registrants outnumber Spanish surname registrants nearly three to one 76.9% to 23.1%.

**The Government of City of Houston**

31. The City of Houston has sixteen council members who, along with the Mayor and City Controller, are elected every four years. Council Members are limited to serving two terms of four years each, with each term beginning on January 2. Five Council Members are elected At-Large, or city-wide, while the other eleven are elected to geographic districts of roughly the same proportion of population.

32. The single-member districts are denoted by a letter. The at-large positions are numbered.

33. On October 12, 2022, the City of Houston adopted a new redistricting plan to be used during the 2023 election cycle.

34. The total population for the districts for use in the 2023 election is as follows:

| District | Population | Hispanic | White | Black | American Indian | Asian | Pacific Islander | Unknown | Two or More Races |
|---|---|---|---|---|---|---|---|---|---|
| A | 220,453 | 122,396 | 52,078 | 28,095 | 454 | 11,803 | 47 | 862 | 4,718 |
| B | 205,932 | 86,564 | 13,226 | 98,476 | 311 | 2,750 | 156 | 754 | 3,695 |
| C | 217,034 | 43,440 | 125,278 | 14,715 | 320 | 22,755 | 115 | 1,297 | 9,114 |
| D | 208,667 | 55,736 | 28,034 | 102,718 | 327 | 16,159 | 156 | 832 | 4,706 |
| E | 217,516 | 80,276 | 94,490 | 20,725 | 484 | 13,207 | 139 | 935 | 7,260 |
| F | 201,350 | 82,776 | 26,822 | 52,218 | 270 | 32,817 | 97 | 2,036 | 4,314 |
| G | 216,315 | 41,789 | 107,888 | 30,785 | 379 | 26,187 | 62 | 1,357 | 7,867 |
| H | 203,200 | 137,769 | 32,761 | 25,675 | 288 | 3,089 | 46 | 624 | 2,948 |
| I | 204,212 | 150,626 | 17,853 | 25,293 | 320 | 7,134 | 42 | 671 | 2,273 |
| J | 200,660 | 126,330 | 19,214 | 33,494 | 268 | 16,642 | 45 | 1,553 | 3,115 |
| K | 209,241 | 85,721 | 28,344 | 77,285 | 249 | 12,647 | 56 | 963 | 3,978 |
| Total | 2,304,580 | 1,013,423 | 545,989 | 509,479 | 3,669 | 165,189 | 960 | 11,884 | 53,987 |

| District | Population | Hispanic | White | Black | American Indian | Asian | Pacific Islander | Unknown | Two or More Races |
|---|---|---|---|---|---|---|---|---|---|
| A | 220,453 | 55.50% | 23.60% | 12.70% | 0.20% | 5.40% | 0.00% | 0.40% | 2.10% |
| B | 205,932 | 42.00% | 6.40% | 47.80% | 0.20% | 1.30% | 0.10% | 0.40% | 1.80% |
| C | 217,034 | 20.00% | 57.70% | 6.80% | 0.10% | 10.50% | 0.10% | 0.60% | 4.20% |
| D | 208,667 | 26.70% | 13.40% | 49.20% | 0.20% | 7.70% | 0.10% | 0.40% | 2.30% |
| E | 217,516 | 36.90% | 43.40% | 9.50% | 0.20% | 6.10% | 0.10% | 0.40% | 3.30% |
| F | 201,350 | 41.10% | 13.30% | 25.90% | 0.10% | 16.30% | 0.00% | 1.00% | 2.10% |
| G | 216,315 | 19.30% | 49.90% | 14.20% | 0.20% | 12.10% | 0.00% | 0.60% | 3.60% |
| H | 203,200 | 67.80% | 16.10% | 12.60% | 0.10% | 1.50% | 0.00% | 0.30% | 1.50% |
| I | 204,212 | 73.80% | 8.70% | 12.40% | 0.20% | 3.50% | 0.00% | 0.30% | 1.10% |
| J | 200,660 | 63.00% | 9.60% | 16.70% | 0.10% | 8.30% | 0.00% | 0.80% | 1.60% |
| K | 209,241 | 41.00% | 13.50% | 36.90% | 0.10% | 6.00% | 0.00% | 0.50% | 1.90% |
| Total | 2,304,580 | 44.00% | 23.70% | 22.10% | 0.20% | 7.20% | 0.00% | 0.50% | 2.30% |

35.  The average or ideal population for a City of Houston single-member district is 209,507.

36.  Total population deviation measures the total percentage difference between the largest district and the smallest district in terms of raw total population. The City of Houston's single-member districts have a total population deviation of 9.45%.

37.  By total population there are four majority Hispanic city council single-member districts, A, H, I, and J.

38.  District A is represented by Councilmember Amy Peck, a Caucasian women with a long history of service to Houston. District A is majority Hispanic in terms of total population. However, the Hispanic CVAP population is only 37.2% and its SSVR percentage is 27.6%.

39.  District H is represented by Councilmember Karla Cisneros, a Latina who is a former Houston Independent School District Trustee. District H has a 67.8% Hispanic in total population. District H has a 50.5% SSVR and 56.5% CVAP.

40.  District I is represented by Councilmember Robert Gallegos, a Latino who is a lifelong resident of Houston. District I is a majority Hispanic single-member district in terms of total

population. District I has an SSVR percentage of 55.7% and a Hispanic CVAP percentage of 65.1%.

41. District J is represented by Councilmember Edward Pollard, an African American lawyer and former college basketball star for Morehouse College. District J has a high total population of Hispanic residents at 63.0%. However, District J only has a 27.7% SSVR percentage and an HCVAP of 37.8%.

42. There are 11 single-member districts in the City of Houston. Of these eleven districts, only two have Hispanic CVAP majorities, Districts H and I. These are the only districts that are currently represented by Latino councilmembers.

43. There are five (5) members of the City Council that are elected at-large, meaning that these at-large districts are elected by the entire City of Houston by position or place.

44. In November 1979 there was a historic sea change in Houston City governance. The Houston City Council went from being almost exclusively male and white to being dramatically more diverse, literally overnight, as voters elected the council's first two women and its first Mexican-American, and tripled the representation of African-Americans.

45. Since 1979, there have been 5 at-large council districts elected by the entire City of Houston. Since 1979, there have only been four people elected in the City of Houston's at-large districts that have Spanish Surnames: Gracie Saenz, Orlando Sanchez, Shelley Sekula-Rodriguez, and Melissa Noriega.

46. Former Congresswoman Shelly Sekula-Rodriguez changed her name to Sekula-Gibbs. She is not of Hispanic descent.

47. Former Councilmember Melissa Noriega is not Hispanic and acquired the name "Noriega" from her former husband.

48. 1979 was the first time a Hispanic candidate was elected to the City Council. Since that time, the City of Houston has had 5 members elected at-large to its City Council per election cycle. In the past forty-three years, only two Latinos have ever been elected to an at-large district to the City Council of Houston.

49. In fact, since 1979, only eleven Latinos have ever been elected or appointed to a single-member district to the City of Houston: Ben Reyes, Cynthia Canales Gorcynski, Felix Fraga, John E. Castillo, Gabriel Vazquez, Carol Alvarado, Adrian Garcia, James Rodriguez, Edward Gonzalez, Robert Gallegos, and Karla Cisneros.

**Houston's Racially Polarized Elections**

50. The City of Houston's municipal elections are marked by a pattern of racially polarized voting between Latino voters and non-Latino Voters.

51. Latinos are politically cohesive in Houston municipal elections and vote as a bloc for Latino-preferred candidates.

52. Non-Latinos are largely politically cohesive in Houston municipal elections and vote as a bloc against Latino-preferred candidates.

53. Non-Latinos vote sufficiently as a bloc to enable them, in the absence of special circumstances (e.g. single-member districts), to defeat Latino voters' preferred candidates of choice.

54. Anglos vote as a bloc and cohesively in Houston municipal elections. They vote as a bloc against Latino-preferred candidates.

55. To allege a discriminatory effects claim under Section 2 of the VRA, Plaintiffs must show that election scheme that is the object of this litigation, plausibly meets three conditions set forth in *Thornburg v. Gingles*, 478 U.S. 30 (1986). Those conditions are: (1) a minority population that

is sufficiently large and compact to form a majority of a single district, (2) the minority group is politically cohesive, and (3) the majority votes as a bloc to defeat the minority.

### *Gingles* I – Latino Single-Member Districting Plan

56. In order to meet the first *Gingles* precondition ("*Gingles* I"), a Plaintiff must also allege that there are enough Hispanic voters "in some reasonably configured . . . [hypothetical] district," *Cooper v. Harris*, 137 S. Ct. 1455, 1470 (2017), to constitute a majority.

57. Latino voters in Houston are sufficiently large and geographically compact to constitute a majority in at least 4 single-member district throughout the City.

58. The plaintiffs reside in putative districts that demonstrate that the community is sufficiently large and geographically compact to constitute a majority in those putative or demonstration districts.

59. The City of Houston contains 2,304,580 million people.

60. If 16 single-member districts were created in lieu of the current districting plan (11 single-member districts, and 5 elected "at-large"), then the ideal population per district would be 144,036 people.

61. The current city of Houston districting plan contains many non-contiguous single-member districts, in part, because the City of Houston contains non-contiguous geography.

62. In addition the recently adopted Houston City Council districting plan contains several bizarrely shaped districts on account of the non-contiguous territory and the use of annexation.

63. The recently adopted City of Houston map contains only two HCVAP majority districts and no majority African American districts, in terms of total population.

**Demonstration District Plan #1**



64. For the purposes of meeting *Gingles I*, the Plaintiffs propound Demonstration District Plan #1.

65. Plaintiff Demonstration District Plan #1 has 4 HCVAP majority districts. Those HCVAP majority districts are Districts 1, 3, 5, and 12.

66. Demonstration District Plan # 1 has 3 majority Black Citizenship Voting Age Percentage (BCVAP) districts. Those BCVAP districts are Districts 4, 11, and 13.

67. The Demonstration District Plan #1 has a population deviation of 7.8%, far less than the recently adopted city council plan.

68. Plaintiff Sanchez resides in District 12.

69. Plaintiff Acosta resides in District 3.

70. Plantiff LULAC has members in District 1 and 5.

71. Districts 1, 3, 5, and 12 demonstrate that the Latino community of the City of Houston are

sufficiently large and compact for at least 4 single-member districts.

### *Gingles II* - Election Analysis of Latino Preferred Candidates in Proposed Districts

72. The second *Gingles* precondition requires that the minority population in the proposed district vote cohesively.

73. In District 1, the Latinos vote cohesively as a bloc for their preferred candidate.

74. District 1 contains the following relevant demographics:

|  | Total Population | HCVAP | SSVR | HVAP |
|---|---|---|---|---|
| District 1 | 138,291 | 64.1% | 55.9% | 71.7% |

75. In urban Houston, Latino voters prefer Latino-surnamed candidates and Democratic candidates.

76. District 1 performs well for Latino-surnamed candidates in re-created exogenous elections:

| District # | %18G D Governor Valdez | %Hispanic Voting Age Population | 20G %Spanish Surname VR | %18G D Land Comm Suazo | %20G D RR Comm 1 Castaneda |
|---|---|---|---|---|---|
| 1 | 67.1% | 71.7% | 55.9% | 69.1% | 64.4% |

77. In every contested election in District 1, the Latino-surnamed candidate outperforms his or her opponent. This strongly indicates that the Latino majority is politically cohesive in District 1.

78. In District 3, the Latino are politically cohesively in District 3.

79. District 1 contains the following relevant demographics:

|  | Total Population | HCVAP | SSVR | HVAP |
|---|---|---|---|---|
| District 3 | 143,235 | 69.1% | 60.8% | 74.1% |

80. District 3 performs well for Latino-surnamed candidates in re-created exogenous elections:

| District # | %18G D Governor Valdez | %Hispanic Voting Age Population | 20G %Spanish Surname VR | %18G D Land Comm Suazo | %20G D RR Comm 1 Castaneda |
|---|---|---|---|---|---|
| 3 | 78.4% | 71.7% | 60.8% | 80.4% | 75.9% |

81. In every contested election in District 3, the Latino-surnamed candidate outperforms his or her opponent. This strongly indicates that Latinos voters are politically cohesive in District 3.

82. In District 5, the Latino are politically cohesively in District 5.

83. District 5 contains the following relevant demographics:

| | Total Population | HCVAP | SSVR | HVAP |
|---|---|---|---|---|
| District 5 | 144,981 | 67.6% | 58.5% | 75.4% |

84. District 5 performs well for Latino-surnamed candidates in re-created exogenous elections:

| District # | %18G D Governor Valdez | %Hispanic Voting Age Population | 20G %Spanish Surname VR | %18G D Land Comm Suazo | %20G D RR Comm 1 Castaneda |
|---|---|---|---|---|---|
| 5 | 74.5% | 75.4 | 58.5% | 76.6% | 72.2% |

85. In every contested election in District 5, the Latino-surnamed candidate outperforms his or her opponent. This strongly indicates that Latinos voters are politically cohesive in District 5.

86. In District 12, the Latino are politically cohesively in District 12.

87. District 12 contains the following relevant demographics:

| | Total Population | HCVAP | SSVR | HVAP |
|---|---|---|---|---|
| District 12 | 144,254 | 50.8% | 40.6% | 71.0% |

88. District 12 performs well for Latino-surnamed candidates in re-created exogenous elections:

| District # | %18G D Governor Valdez | %Hispanic Voting Age Population | 20G %Spanish Surname VR | %18G D Land Comm Suazo | %20G D RR Comm 1 Castaneda |
|---|---|---|---|---|---|
| 12 | 74.3% | 71.0% | 40.6% | 76.1% | 72.0% |

89. In every contested election in District 12, the Latino-surnamed candidate outperforms his or her opponent. This strongly indicates that Latinos voters are politically cohesive in District 12.

### *Gingles III* – Election analysis of Non-Latino Voters

90. The third *Gingles* precondition requires that the non-Latino voting bloc usually defeats the minority-preferred candidate under the current districting.

91. Latino voters in Houston strongly prefer Latino-surnamed candidates.

92. However, in "at-large" elections, the Non-Latino voting bloc votes sufficiently cohesively as a bloc against Latino surnamed candidate to usually defeat them in the absence of special circumstance, like single-member districts.

93. This has been proven true historically. After the election of the first Latino Houston City Councilman in 1979, there have only been 4 Latino-surnamed candidates elected in "at-large" districts. Two of these candidates has Latino surnames by affinity. In the past 43 years, many Latino candidates have been defeated in these "at-large" districts, while only a few have been successful.

94. This also has been proven by data. There are roughly 1,021 Voter Tabulation Districts ("VTDs") or election precincts wholly or partly contained in the City of Houston. 206 of these VTDS are zero population blocs, meaning no voters live there.

95. Of the remaining 815 VTDS, 124 had a Spanish Surname Turn Out ("SSTO") percentage of 50% of greater in the 2020 General Election. In those precincts, Chrysta Castaneda – a

14

candidate for the Railroad Commission of Texas – received 64.9% of the vote.

96. The remaining 691 VTDs all had an SSTO percentage lower than 50%. In these precincts, Chrysta Castenada performed far worse than in top Latino precincts.

97. In 2018, there were 1,020 VTDS. There were 209 VTDs without any population. The race for Governor featured Governor Abbott verse Lupe Valdez. In this race, there were 121 precincts with greater than 50% SSTO. In those precincts, candidate Valdez received 70.5% of the votes cast. In the remaining precincts, candidate Valdez faired far worse.

98. The history and data are clear. The Non-Latino majority votes sufficiently together to usually defeat the candidate of choice of Houston's Latino community in the absence of special circumstances like single-member districts.

## Totality of Circumstances

### i. History of Discrimination

99. Texas has a despicable and regrettable history of racism.

100. Several of Houston's neighborhoods also evidence a troubling history of residential segregation and racial conflict.

101. Throughout the 1970s, Harris County public schools were racially segregated. In Texas public schools today, school populations continue generally to reflect the racial segregation of the past.

102. The same is true in Houston in total, where significant patterns of residential segregation exist and there have been instances of schools being defaced with hate speech graffiti and spray-painted racial slurs.

103. Latinos, African Americans, and Asian Americans have each historically suffered from official discrimination affecting their right to vote.

### ii. Racial Polarization

104. In the State of Texas, Harris County, and Houston, Anglos support different candidates than either Latinos or African Americans.

105. Elections in Houston are deeply racially polarized.

106. Throughout Texas, federal courts have found that Texas elections bear the taint of racial polarization. "Regardless of methodology… experts [have] found that general election and primary election voting in Texas is highly polarized along racial-ethnic lines." *Perez, et al v. Abbott, et al.,* No. 5:11-cv-00360-OLG-JES-XR at ¶ 690 (W.D. Texas March 10, 2017) (Fact Findings General and Plan C185).

107. "Hispanic voters are politically cohesive in general and primary elections. African-American voters are politically cohesive in general and primary elections. With the exception of Travis County, Anglo voters are politically cohesive in general elections in support of the Republican candidate, regardless of the candidate's race." *Id.* at ¶¶ 703, 704, and 707.

108. Federal courts have recently found that elections in Harris County also evidence strong signs of racial polarization. "[T]he Latino community does not merely vote straight party ticket, instead they are bloc voting Latino surnamed candidates…..Moreover, when Anglos have the opportunity to choose between a Latino Republican candidate or an Anglo Republican candidate, they tend to choose the Anglo Republican candidate. Thus, the evidence shows that race is playing a factor in the decisions of both Anglos and Latinos in their selection of candidates." *Rodriguez v. Harris Cnty.,* 964 F. Supp. 2d 686, 777 (S.D. Tex. 2013).

### iii. Existence of Electoral Mechanisms which Dilutes the Latino Vote

109. In the past decade, the State of Texas has erected several barriers to minority participation which enhance minority vote dilution.

110. In 2011, Texas enacted one of the most stringent voter qualification laws of the United States. Voter ID was the law of the land until enjoined because of violations of Section 2 of the Voting Rights Act and the 14th Amendment. Initially, Texas also was found to have intentionally racially discriminated against minority voters by the enactment and enforcement of its Voter ID law.

111. Also in 2011, Texas enacted several redistricting plans, many of which violated the 14th Amendment and Section 2 of the Voting Rights Act. A three-judge panel found that in adopting those plans, Texas had intentionally discriminated against minority voters.

112. In 2019, Texas instituted a voter purge of its voting rolls, supposedly targeting non-citizen voters. However, Texas was enjoined before enacting its purge because Texas had in actuality haphazardly removed more citizens than non-citizens from its rolls. Texas settled these claims before a court could make a determination of the legality of Texas' intent.

113. Harris County, itself, has had a troubling history of voter disfranchisement. "In 2008, a number of Latino residents reported that the Harris County Tax Assessor's Office, which is responsible for voter registration, was not timely processing the voter registration applications of Latino citizens….The Harris County Tax Assessor–Collector and Registrar of Voters, Paul Bettencourt, used his position in 2008 to slow the dramatic rise in voter registrations that year among younger, mostly minority, applicants." *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 781 (S.D. Tex. 2013).

114. And, in the recent past, Harris County also failed to provide bi-lingual voting materials that would assist non-English-speaking voters.

115. Houston at-large method of electing some of its city councilmembers is yet another practice and procedure that has had the result of impairing Latino and other minority's electoral

opportunities. These practices include, but are not limited to, the conduct of at-large elections, staggered terms, and off-year elections.

### iv. Socio-Economic Disparity

116. In Harris County and in Houston, a strong and consistent correlation exists between socio-economic welfare and race, such that Latinos and African Americans are more likely to be economically disadvantaged than their Anglo peers.

117. Anglos have a mean per capita income of $45,278, which is almost three times the $14,511 mean per capita income for Latinos. Moreover, median income for Anglo households is more than twice that of Latino households, with median income of Anglos totaling $75,124, compared to the $38,916 median household income of Latinos. African Americans in Harris County have an unemployment rate of 10.9%, which is more than twice the unemployment rate of Anglos. In Harris County, the per capita income for African Americans is $22,511, which is less than half the Anglo median income.

118. The American Community Survey (ACS), a data project of the U.S. Census Bureau, indicates that Latinos have a higher incidence of poverty than do Anglos. According to the ACS, 9.2% of Anglos earn less than 150% below the poverty level, but 34.5% of Latinos earn less than 150% of the poverty level. The African American poverty rate in Harris County is 15.9%.

119. Latinos in Harris County also are substantially more likely to have received less education than Anglos: the ACS indicated that 28.3% of Latinos over the age of 25 had completed nine or fewer years of education, whereas only 1.8% of Anglos over the age of 25 had completed nine or fewer years.

120. Under the de facto segregated public school system in Harris County, thousands of children were not provided appropriate educational resources necessary to learn the English language.

Today, those children are adults with limited English proficiency. These limited-English-proficient adults do not possess the requisite language skills to facilitate their participation in the democratic process.

121. Economically disadvantaged people tend to become disaffected, believing that government does not and will not respond to their needs. This also lowers their participation in elections.

122. The socioeconomic disparities which exist in Harris County and in Houston impact the ability of the minority community to influence state officials, state elections, and state educational policy, as a whole.

### v. Racial Appeals in Political Campaigns

74. Political campaigns in Houston and Harris County have been characterized by overt and subtle racial appeals.

### vi. Success of Latino Candidates

75. Latino-preferred candidates were rarely successful or not ever successful in at-large elections in Houston municipal elections.

### vii. Tenuousness of the policy of At-Large Elections

76.  The at-large system of election is not mandated by state law. In fact, hundreds of Texas cities elect their councilmembers solely from single member districts.

77.  No sound policy reason or rationale exists for the continued use of the at-large system for electing Houston city councilmembers.

78.  In totality, the at-large method of electing the Houston city councilmembers dilutes the voting strength of Latinos and other racial or language minorities.

## V.   CAUSE OF ACTION - SECTION 2 OF THE VOTING RIGHTS ACT

79.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

80.   The choice by Houston to elect five of its council members through an at-large process is an election practice that results in the denial or abridgement of the right to vote of the individual plaintiff on account of her race, color, or ethnicity, by having the effect of canceling out or minimizing the individual voting strength as minorities in Texas. This election system does not afford the individual plaintiff an equal opportunity to participate in the political process and to elect representatives of her choice, and denies the right to vote in elections without distinction of race, color or previous condition of servitude in violation of 52 U.S.C. §10301 *et seq*.

81.   Under the totality of circumstances, the current at-large method of electing five Houston city councilmembers violates Section 2 of the Voting Rights Act, 52 U.S.C. §10301, because it results in Latino and minority citizens having less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

82.   Unless enjoined by order of this Court, Defendants will continue to violate Section 2 of the Voting Rights Act by administering, implementing, and conducting future elections for the Houston using an at-large method of election.

## VI.   REQUEST FOR INJUNCTIVE RELIEF

83. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

84. At trial, Plaintiffs will likely succeed on the merits, because Houston's at-large election system has the force and effect of diluting Latino voting strength in Houston municipal elections. There is a sufficiently large and compact community of minority voters within Houston that vote as a cohesive bloc. Non-Latinos in Houston vote as a bloc against Latino-preferred candidates.

85. Plaintiffs will suffer immediate and irreparable injury if the Houston is allowed to continue utilizing an at-large election system, which will diminish the right to vote in councilmember elections in the near term and injures federally-protected voting rights.

86. There is no harm to the City of Houston by allowing the plaintiff and other voters the ability to elect all councilmembers in single-member districts, which will allow all voters the right to cast a meaningful vote in Houston municipal elections.

87. An injunction is in the public interest, because the right to cast a meaningful vote is the foundation upon which all other rights and freedoms are based. The right to vote for the civic leadership of a municipality is granted by statute, protected by federal and state law, and guaranteed by the U.S. and Texas Constitutions. It is in the public interest of Houston to protect the right of every person to cast a meaningful vote to elect leaders to public office.

88. Plaintiffs have no other adequate, plain, or complete remedy at law other than enjoining the at-large trustee election system of the City of Houston.

89. Plaintiffs request that the Court enter a permanent injunction prohibiting Defendants from using its current partial at-large election system because of its immediate and irreparable harm to minority voters.

**VII. CONCLUSION AND REQUESTS FOR RELIEF**

90. For the foregoing reasons, Plaintiffs respectfully request that Defendants be cited to appear and answer and that the Court take the following actions and grant the following relief:

    A. Appropriate preliminary and permanent injunctive relief to which Plaintiffs show they are entitled;

    B. Entry of a declaratory judgment as described above;

    C. Attorneys' fees and court costs; and,

D. Any other or further relief, in law or equity that the Court determines that plaintiff is entitled to receive.

**DATED**: December 5, 2022                    Respectfully submitted,

By: */s/ Jose Garza*

State Bar No. 07731950
LAW OFFICE OF JOSE GARZA
7414 Robin Rest Dr.
San Antonio, Texas 78209

The Law Office of Martin Golando, PLLC
Texas Bar No. 24059153
2326 W. Magnolia
San Antonio, Texas 78201
Office: (210) 471-1185
Email: martin.golando@gmail.com
*Pro Hac Vice Pending*

**ATTORNEYS FOR PLAINTIFFS**

22